Good morning again. Ms. Mathewson, are you ready to proceed? Thank you, Your Honor. May it please the Court, I'm Lisa Mathewson representing Appellant Wayne Bryant. I'm here this morning to speak jointly on behalf of both appellants on the issue of Section 1346 and Section 666, and on behalf of Mr. Bryant on pension issues, just briefly, if the Court wishes to hear them. I'd like to reserve, pursuant to our division of time form, we've associated 13 minutes with my argument, and I'd like to reserve two of those minutes for rebuttal. Mr. Jacobs, who will argue jointly on behalf of both appellants on separate issues, will separately request of the Court one minute of his time for a rebuttal to be delivered by Mr. Frye. Skilling, which I guess is one of your key arguments, dealt with concealment of a conflict of interest. But did Skilling touch on anything relating to bribery? It does, Your Honor, because Skilling instructs the Court to return to the core of quid pro quo bribery. And in so doing, it cautions the courts of appeal to examine any engraftment to the concept of bribery that postdate the enactment of Section 1346. It instructed the courts to examine the pre-McNally case law for clues to congressional intent in enacting Section 1346. And it approved a bribery theory only if it comports with that core concept of bribery as reflected in the pre-McNally case law. What was defective then in the judge's charge of this? It seems that she mentioned quid pro quo a number of times. I mean, directly in the jury's instruction. She did, Your Honor. And what is defective are not the statements of quid pro quo themselves, but then the definitions of quid pro quo that were given later in the instructions. And two in particular fatally undermined the concept of quid pro quo. The as-needed part? Yes, and the dual purpose. And the dual purpose. All right. What's wrong with the as-needed? I mean, this was – it was tied to specific action, was it not? It was not, Your Honor, although it did contemplate the taking of action in the future. The flaw of the as-needed instruction is that it does not require any link between the thing of value and the official action at the time of the illicit agreement. In other words, an as-needed theory is essentially a retainer theory. It's a theory that encompasses the concept of purchasing a supporter rather than purchasing an official action. To perform specific acts. But those specific acts. And they were performed. The specific acts, Your Honor, that were eventually performed could not have been identified or identifiable at the time of the agreement. Now, this court had presciently and, frankly, ahead of a number of courts of appeal, previously recognized that Section 201 is the key to interpreting Section 1346 bribery. And Skilling validates that analysis by this court. In fact, instructing the courts of appeal to use Section 201 and Section 666 when interpreting bribery under the otherwise vague honest services fraud rule. So that means our case in Kemp is still good law, right? It doesn't, Your Honor, for this reason. As the government points out, Skilling did cite Kemp. However, the government urges this court to conclude that that citation was a specific endorsement of the as-needed concept. But Skilling actually cited six pages in Kemp, several of which embraced the conflict of interest theory, which Skilling very clearly overruled. So Skilling's citation to Kemp, if one examines the Skilling opinion, one will see that Kemp and, in fact, Ganim in Whitfield, the Second and Fifth Circuit cases on which the government also relies, were cited only for methodology. The Supreme Court said, Justice Ginsburg said, use 201 and 666 to interpret 1346, and said see for example Kemp, Ganim, and Whitfield. The court not only cited six pages from Kemp, but two pages from Ganim and three from Whitfield or the other way around. One of those discussions that it cited specifically noted the disagreement between the Kemp court and the Ganim court on certain issues. The bribery requires a quid pro quo, right? Yes. And Kemp said that both the Supreme Court case and saying the bribery requires a quid pro quo. And Judge Wolfson gave an instruction saying that you need to find a quid pro quo here. What was wrong? The instruction, Your Honor, went on to say that quid pro quo encompasses the concept of availability, quote, as needed for future official action that is not identified at the time of the exchange. The instruction said, in other words, when payments are accepted by a public official from a payer with the intent to obtain that official's actions on an as-needed basis, so that when the opportunity presents itself that the public official takes specific official action on the payer's behalf in return for those payments, that constitutes a breach of the public official's duty of honest services. It didn't talk about availability on an as-needed basis. It said, as needed, he won't alter his official action in exchange for the quid. Your Honor, your Honor just used a critical word, which is alter his official action. And the government… Is alter any different than influence? The government conceded that it's not, Your Honor, and I agree with that. Don't you also agree that influence is enough? Influence and alter are the same, Your Honor, and therefore intent to influence and intent to be influenced are the definition of quid pro quo. And here's why that undermines, or why as-needed undermines that. Because one cannot intend to influence an action that one doesn't even know will come to pass. If the action is not identifiable at the time of the agreement, it is impossible to have an intent that that action be influenced. In fact, the court… Well, what was the evidence about what Mr. Bryant, what Senator Bryant was expected to do? I mean, it was pretty… Wasn't it laid out in the evidence that he was supposed to direct additional monies to the… The evidence, Your Honor, certainly showed that at the same time that Senator Bryant was employed by UMDNJ, that he did take official action voting funding for UMDNJ and its school, SOM. But we contend that the mere simultaneity of the official action and his employment was insufficient to demonstrate the quid pro quo. And, Your Honor, as Your Honor's question suggests, SOM certainly may have had in mind that it was winning itself or purchasing itself a supporter in Trenton. Was the evidence to that effect? Yes, Your Honor. In fact, the evidence was legion that in the course of his employment, Senator Bryant was led to learn a lot about the very worthy programs that SOM was supplying. And this gets into our 666 argument where we contend the 666 instruction permitted conviction on mere simultaneity of an intent to influence that may or may not have been wrongful. Because the intent to influence Senator Bryant was by exposing him to the valid and worthy programs that SOM was supplying to his longtime constituency, the underserved of South Jersey. So the concept, Your Honor, of availability as needed, to return to Your Honor's original question,  as opposed to purchasing specific official actions by that supporter because by hypothesis... Why are they mutually exclusive? Especially when this person was on what, the Appropriations Committee? He was on the Appropriations Committee. He chaired it. And was leader. Yes, Your Honor. A properly instructed jury could conceivably draw a quid pro quo inference from these facts. But this jury was not properly instructed. And the proof actually failed on quid pro quo, as we contend separately. But in terms of the instruction, his mere availability as needed, or the intent to obtain his official actions on an as-needed basis whenever the opportunity presents itself, actually fits squarely within the definition in Sundiamond and later in the Kemp case of a future official action that the public official may even already have determined to take. And that's language right out of Kemp because Kemp had already determined, as the Supreme Court now encourages the courts, to use Section 201. In Section 201, the gratuity theory that the Sundiamond court construed, Justice Scalia in that decision cautioned that it's essential to distinguish between bribery, which is the purchase of the action, and gratuity, which is payment to the public official in the hope of encouraging future official action. And the Kemp court endorsed that concept. Future official action that the public official may already have determined to take is a gratuity concept. And this is an important point, Your Honors, because the government chides us for suggesting that courts, juries, judges, cannot punish conduct of this sort at issue here. The question is not whether this conduct is a crime or whether this conduct is undesirable or whether this conduct should be prohibited. The question is whether it's this crime. And the Supreme Court in Skilling has cautioned the courts of appeal to return to the core concept of bribery. And that core concept is the purchase of an identifiable official action. As Justice Scalia explained in Sundiamond, absence of an identifiable official action, there's no way to determine whether the action in question, the action that's being treated for the thing of value, is in fact within the definition of official action. Why isn't the as-needed simply referring to the timing of the actions of Senator Bryant here? Does it have to induce immediate action? No, Your Honor. In fact, the temporal connection is not implicated by the as-needed language. The court made very clear that a bribe may even be paid after the official action, but the question is causation, essentially. The quid pro quo concept is a causation concept. But I thought the court was pretty clear when the court said that not every payment made to a public official constitutes a bribe. A payment made in a general attempt to build goodwill or curry favor with a public official without more does not constitute a bribe. What distinguishes a bribe from other payments that would not constitute violations is that a bribe is offered or accepted with the intent to influence or to be influenced in an official act. That's on JA4419. How can it be more clear than that? I completely agree with that statement from Kemp, Your Honor, but then Kemp went awry when Kemp went beyond a certain fact. That was the instruction. That was the actual instruction given. But then the court in Kemp as well went on to instruct, as did the court here, on the concept of as-needed. And that's where Kemp went beyond facts because the facts in Kemp were a series of payments and a series of official actions and not a retainer agreement. And the court will see in reviewing the record here that the government in this case has repeatedly emphasized at closing argument the concept of retainer. We've got him on retainer. Let's just roll him out for a future official action. And to go to Judge Van Aske's point about the intent to alter, that's the reason that the concept of retainer, of as-needed, is inconsistent with quid pro quo because when one is convicted of being on retainer, the official action is not identifiable and therefore may or may not actually be altered. We don't need an actual alteration. I think we were clear about that in our briefing. But the intent to alter the official action is essential. It's identical to intent to influence the official action. And when the official action has not yet been identified, it's impossible to say whether one intends to influence it. That's why the First Circuit in its Urquioli 2 decision, the first court of appeals decision as far as I know to post date scaling, actually approved a jury instruction that referred to intent to alter or to cause an official action that would not otherwise have happened and identified that intent to alter the action as the key distinction between bribery and a conflict of interest theory. Now the district court here and the government on appeal use this concept of thumb on the scale, that a retainer agreement with a politician, which we concede is undesirable and should be prohibited. Probably could be Hobbs Act extortion theory, certainly could be a gratuity theory, may violate a federal conflict of interest statute in the case of a federal public official. At any rate, the retainer agreement is not an exchange of the thing of value for the official action. The retainer agreement is the exchange of this person's ability to take unspecified future official action. And that is squarely within the definition that the Supreme Court calls gratuity. I thought the case law says you don't really have to complete  That's true, Your Honor. Here, the action was completed, and the person took action pretty quickly to make sure that P. Bryant kept up his end of the bargain. Your Honor, we do not contend that the action need be completed. What we do contend is that there must be an intent to alter But doesn't that action being completed look back to a jury and say, hey, there is intent here? No, Your Honor, because the action being completed was, in fact, as the proof showed, perfectly consistent with Senator Bryant's ongoing legislative priorities. In fact, just for one example, with respect to the $800,000 in funding for the New Jersey CARES Institute, the Child Abuse Institute, Senator Bryant had previously voted SOM's funding went up after he was provided this job at SOM. Is that correct? That's correct. How much additional funding was there year over year? That depends how one calculates it, Your Honor, and I don't mean to fudge, but it became an issue as to a share, for example, of the overall UMDNJ system funding because, for example, what happened was the UMDNJ system funding remained relatively constant, but there was, for example, for money that was intended to... It does. But, Your Honor, again, we don't contend that there's nothing wrong with this. We admit that the government perhaps could have pursued, for example, a Hobbs Act theory, perhaps could have pursued a gratuity theory, but all of these concepts of the retainer, of purchasing a supporter in Trenton, undermine the concept of quid pro quo because they are squarely within what Sundiamond would call a gratuity theory and skilling instructs the court to return to the core of bribery. Now, the government says that the Seventh Circuit, in the Gorney case, pre-McNally, had in fact endorsed an as-needed stream-of-benefits concept in an honest services case. But Gorney actually supports our point of view here because Gorney applied an Illinois statute that did not require reciprocal intent. In other words, the Illinois statute, consistent with Hobbs Act extortion, actually, and the Supreme Court's Evans case, required only that the public official accept a payment knowing it was intended to influence him, knowing it was intended by the payor to influence him, as distinct from intending to be influenced. In other words, Gorney applied a statute that did not require reciprocal intent. And in a context that does not require reciprocity, that causation concept that's at the heart of quid pro quo, it may make sense to endorse a retainer theory. However, it is only in that context, where a statute does not require quid pro quo, that the retainer theory makes sense. Did the evidence show that Senator Bryant altered his conduct or behavior as a result of this retainer theory? As a result, no, Your Honor. Pardon? No. Did not. That's our contention. And to expand upon that a little bit, Your Honor, there was certainly new information that Senator Bryant got in the course of his employment that certainly informed him about some of the worthwhile programs that SOM was pursuing. Well, then you're getting into the dual purpose. Exactly. And to move into that, I'll take that segue, Your Honor. The dual purpose test fails for the same reason as the as-needed test, because it undermines the concept of quid pro quo, an action that would have happened anyway in the absence of the thing of value, is not exchanged for that thing of value. And is that the evidence demonstrates that SOM would have gotten that additional $10 million in any event? I don't think I could say the evidence conclusively demonstrates that, Your Honor, but neither did the evidence demonstrate the opposite, which is the concept of the salary having been exchanged for the official action of voting and funding for SOM. The evidence did demonstrate, for example, Your Honor, that the president of the university testified that he himself had intended to take measures to restore per-student parity. The funding in question, the carve-out that Your Honor referred to, actually originated in the Assembly. Senator Bryant was in the Senate. But the language and the budget originated in the Assembly. And so we contend that the evidence did not establish, certainly, even that he was the prime mover behind it, because all parties seemed to agree that restoring per-funding parity was a goal that the university itself... If a leader of the Senate wants something, the Assembly is going to pay attention. That's an incentive. Especially the leader of the Appropriations Committee. There was no evidence to that effect, Your Honor. Isn't the government correct that if it need not prove that an official act was undertaken at all in response to a bribe, and we've talked about that, it certainly can't be required to prove that the official act was undertaken for one reason as opposed to another, or over another. It has to be correct, doesn't it? It does, Your Honor. I think we agree with that. Because we say the government does have to prove that the official action is taken in response to the bribe. It may not be the predominant reason. What is your dual-purpose argument? The dual-purpose argument, Your Honor, is that it does have to be the causal factor. And if it's not a causal factor, then it's not bribery. Because taking an official action one would otherwise have taken for any other reason might be gratuity, might be Hobbes Act extortion, might be any number of other theories. But it's not bribery, because then that official act is not traded. Then it's the difference between purchasing the official action and purchasing the possibility of taking the official action. But isn't there a whole case to the jury that there was a trade here, and the jury agreed with that, the government's theory? They emphasized repeatedly, Your Honor, in closing argument that they needed to show only one, basically one drop of corruptness. And this is just a quote from closing argument. For example, this is in the appendix at 4556. Even if he did some legitimate things, the job was still corrupt. They quoted the dual-purpose instruction at 4923. They told the jury repeatedly that the presence of a legitimate purpose, whether for the official actions or for the official... But the actual jury instruction was at 4419. It was, you may find any salary and other financial benefits accepted by Wayne Bryant was a bribe, even if you also find that it was paid in part for legitimate work, if it was also paid in part in return for Wayne Bryant's official action. And that instruction, Your Honor, is internally inconsistent, because it's not being paid in return for Wayne Bryant's official action if the same salary would have been paid for legitimate actions. Now, we get into a little bit of... I'm not sure I get you, but you might want to clarify that. Yes. And let me just make one factual clarification here. The district court treated the salary and the other benefits that Wayne Bryant received as a unitary bribe. And I think this is important for this concept of dual purpose, because this is not a question of $30,000 a year in salary, $20,000 of which may have been in return for legitimate action, $10,000 of which may have been a bribe. That's not how the evidence played out. And, in fact, the district court declined to apply an enhancement for more than one bribe at trial because she said the government had proven the stream of benefits as a unitary thing. So the question is, would Wayne Bryant have gotten the salary absent his official action, and would Wayne Bryant have taken these official actions absent the salary? The presence of competing motivations, either one of which might have been a sufficient causal factor for the quid or the quo, negates the concept of exchange. And not to denigrate it, Your Honor, but I had the example of the pizza delivery in the brief. But, you know, the difference between paying to have your food delivered and tipping the delivery person is the difference between bribe and gratuity. If they would have paid Wayne Bryant for the legitimate services that he rendered, then that's not a quid. A $35,000 low-show job is just a gratuity? Yes, Your Honor. Okay. Or it could be, Your Honor, Hobbs Act extortion. And that's probably the more likely theory that could fit, because the low-show job, Your Honor... Now, as a matter of proof, we contend on both angles, Your Honor, legally and as a matter of proof, that the government failed to demonstrate that the job would have happened without the official actions, and more critically, from the perspective of Bryant's counsel, failed to demonstrate that the official actions would not have happened absent the salary, because the official actions were perfectly consistent with Senator Bryant's legislative priorities. Now, the government points to the recent... the First Circuit's second Archioli decision, and some language in that that appears to approve a dual-purpose theory. But it's important to examine the context in which that arose, and it goes to Your Honor's point. In Archioli, they were not examining a jury instruction. In Archioli, the jury had been instructed explicitly that it had to find an intent to alter an official action or to change an official action that would not otherwise have taken place. That properly instructed jury was able to examine the competing motivation, the evidence of competing motivation. And in fact, the Archioli language, the court said, this jury could find that the compensation nominally for marketing was in reality for the official's misuse of his powers. And that reference to in reality suggests that what the court is referring to is the jury's ability to weigh competing evidence of legitimate and illegitimate motivation. The court goes on to refer to payments primarily intended, and as the court knows, we did request a de minimis instruction as a fallback, and we do persist in that. I see my time is up. I would love to address the 666 issue. I'd like you to address the restitution issue before you sit down. That's for Mr. Jacob. We'll get him up then. And if the court would permit argument on the 666 issue. We'll give you two minutes, sure. Just briefly, Your Honors. The critical question here is whether Section 666 bribery requires a quid pro quo. The Solicitor General in its opposition to the petition for certiorari in the McNair case, which actually was just denied yesterday. But the jury was charged that 666 required a quid pro quo. Was it not? It was not, Your Honor. The 666 instruction, which is in the record at 5448, it's jury instruction number 33, and then those that follow, actually required a mere temporal overlap because it referred only to taking official action while... Use the language quid pro quo. Yeah, with respect to Wayne Bryant, that Wayne Bryant corruptly accepted, agreed to accept, solicited, or demanded salary payments and other financial benefits from UMDNJ slash SOM. The quid while intending to be influenced in taking favorable actions toward SOM in its capacity as a state legislator. The quo. Yes, Your Honor, but the while is the critical problem there because while intending to be influenced is not the same as intending to be influenced by the salary. That's mere temporal overlap, and that's the critical problem with the 666 instruction. Now, the government contends that 666 doesn't require quid pro quo at all. You're now saying temporal overlap. I thought you were saying there's some sort of temporal conflict of interest before in your brief. Is there a difference? Well, the mere temporal overlap, Your Honor, would be a conflict of interest, and it would be a mere conflict of interest. The temporal overlap would not be the quid pro quo. How do you think a juror is going to think while is what you just said it whittles down the offense to nothing more than a temporal conflict of interest or an overlap? The court specifically said, Judge Wolfson, there's a quid and there's a quo. If you find one intending to be influenced leads to the other, you can convict under 666. Because she didn't say, Your Honor, leads to the other, which she said is while. And that, in common parlance, is a temporal concept. In fact, the court has... But aren't the key words intending to be influenced? Intending to be influenced, yes, Your Honor, but that permits conviction of legitimate influence because it does not say intending to be influenced by the thing of value. It simply says intending to be influenced at the same time as working there. And that's the... By the way, she flipped it around with respect to Gallagher to do the inverse. What was the quid and what was... I mean, I thought she was very careful there. Your Honor, she was very careful there as the statute requires to distinguish between Gallagher and Bryant, but in both instances she used the term while, which in common parlance as a juror would apply it, is a mere temporal concept. Instead of saying intending to be influenced by the salary or intending to perform the official action in exchange for the salary, what she said is that the intent to influence coexists temporarily, while, with the receipt of the salary and the official action. And that's exactly what the fact permitted here, Your Honor, for the reasons I described earlier. Your Honor, this Court has previously, in a number of different contexts, which are described in our brief, recognized this temporal language for various purposes, including carrying a firearm and other distinct areas, has used this temporal language and recognized its effect on jurors as being a temporal concept, as opposed to the causation concept that quid pro quo actually requires. And in this case, although the government says that the jury necessarily found quid pro quo with respect to the honest services count, that is not true for the reasons described earlier. The honest services instructions actually undermined quid pro quo. The burdens on the government here in terms of harmlessness to demonstrate harmlessness beyond a reasonable doubt, that's no reasonable probability that the jury was influenced by this common-sense temporal term, while. And although the government mentions Antico in its 28-J letter, which is more in the nature of a surreply in this case, Antico was a plain error case. And we're not here on plain error, Your Honors. Antico and its results do not govern the result here. Thank you. Ms. Mathewson, thank you very much. I'll have you back. No, no. We'll hear from all the appellants. Thank you, Mr. Brooks. Mr. Jacobs? Thank you, Your Honor. Good morning. My name is Ralph Jacobs. I represent Dr. Gallagher, and I'm here to argue on behalf of both appellants that the prosecution improperly impeded defense access to witnesses and that the order of restitution in this case was improper. I would like to reserve one minute. Yeah, that's fine. On the subpoenas, whatever problem may have existed, wasn't it completely cured here? It was not at all cured, and I think that goes to the nature of the impediments that were placed. What did the court do to remedy? What the court did is instructed the prosecution to write a letter to the grand jury witness to inform them that they were free to speak to the defense if they wanted to. And if this had been merely an informational error or confusion, that kind of prospective remedy might have been adequate. But this was not merely a question of confusing or even improper information. This was a deliberate effort to impede defense access to witnesses. What else would you have had Judge Wolfson do to remedy the request? It wasn't, in some cases, there were instructions, in some cases there were hints of dire consequences if you testified, but here it was just the request. And yet the court said, hey, write a letter, tell them they're free to testify. What else would you have her do? Respectfully, this was much more than a request. This was a use of the court's subpoena, which starts out saying, you are commanded. And then there's an endorsement of this language in the, essentially, parroting the language of a federal criminal statute. But it's not only the prosecution's use of the grand jury subpoena. It's then in the grand jury room where witnesses are there without counsel, and essentially the prosecutor tells them that the grand jury is requesting that they don't disclose anything. And frankly, there's nothing in the record that suggests the grand jury made any such decision or vote to make that request, nor would they have the authority. What other remedy would you have suggested here? The appropriate remedy in this case is to exclude witnesses who received this pervasive, repetitive, institutional... So it can't be cured in your view? It can't be cured under the circumstances of this case. And there was prejudice. And there was prejudice. And in particular, it's important to understand what happens in these cases. This is a grand jury investigation that was going on in 2006. There's not any question that there was any particular reason to keep things secret. The scope of the grand jury investigation was well understood. This was an institutional decision as it came out at the hearing on this motion that in every case, every grand jury subpoena issued out of that U.S. Attorney's office was going to carry this. This was a political corruption case, but if it had been a crime syndicate, organized crime, big drug ring case, would notices like this ever be appropriate? If the government said there was some specific need here, it might be a different case. There are some courts which have held on a very high threshold that yes, with court approval, the court process, the court's grand jury, might be able to make this request. There's no suggestion on the record here, no effort to justify this kind of conduct. In fact, at the argument below, our adversary really drew the bright line. It says on page A349 of the record that the government is not supposed to discourage contact. What showing of prejudice did you make? What we showed is that there were efforts to speak to witnesses, and those efforts were frustrated. Now, what we don't have is we don't have the specific testimony that was lost. But the problem is in these cases, don't you need that to show the prejudice? We don't, because the fundamental right to interview witnesses, it's so integral to the right to counsel, it's the basis for an effective cross-examination. Indeed, when counsel failed to make efforts to interview, that's often viewed as ineffective assistance of counsel. So it is so fundamental that when that right is impeded, and it is impeded deliberately, and it is impeded in violation of Rule 6E, which says very clearly, no obligation of secrecy can be imposed except pursuant to this rule. The court below found compulsion. The defense, I'm sorry, the prosecution says this was, quote-unquote, merely a request. But this was no more a request than when the patrol car pulls up behind you and the loudspeaker says, please step out of the car. The court below was absolutely right saying this is compulsion, and the cases say that this should be approached in a common-sense way. Diamanti says any reasonable witness would have understood it this way. Workman says a clear import of this language... But what... I'm sorry, go ahead. No, no, you want to finish up here? I was just going to... I still don't understand what the prejudice was. You said they were frustrated, but we don't know exactly what testimony there wasn't given. I mean, it seems like you've reached a dead end on this particular issue. Let me try and articulate what's so important about being able to speak to witnesses, because this is a case in particular in which there were nuanced conversations, tone of voice, particular word choice that was critical to the state of law. The defense did speak to the witnesses it needed to speak to, did it not? No, it didn't. In some cases, it continued to be unable to. So if there had been an evidentiary hearing, there might have been further inquiry as to specific witnesses. Okay, so which testimony did you not get that you think would have been critical to your case? What I'm saying is if we could have interviewed witnesses much earlier on, we would have been able to get details that are now lost. If the government were obliged to turn over a box of documents, but for whatever reason shredded them instead, and you said, how was I harmed, I would have to say I can show you how these documents are in general material to the case, but I can't unshred the documents. Did you identify any witness that I can't remember? I remembered two years ago when I testified before the grand jury, but I can't remember now. No, we did not have that opportunity because we didn't get an evidentiary hearing. So I submit that at the very least, an evidentiary hearing should have been granted so that we could demonstrate the specific prejudice. But what we have here is we have witnesses, all the crucial witnesses, or virtually all the crucial witnesses in this case, being given this institutional message, don't talk to them, a message that has been characterized as troubling. I think we understand your argument on this. Tell us about the restitution. Why is that improper? For two reasons. First, the Mandatory Victims Restitution Act only allows restitution to victims. UMDNJ was not a victim in this case. The case was indicted and tried on the theory that this conduct was for the benefit of UMDNJ. Did monies that were increased to SOM, were they then carved out of the budget of the main entity? If you're speaking of allocation among the institution, there was the evidence at trial, and I don't think the judge made a finding on this particular point for restitution, but the evidence at trial was that those carve-out funds, those make-up funds, because South Jersey had been slighted in the funding formula, were approved of by the highest officials at UMDNJ. But regardless, the theory of this case is that Bryant's salary was part of a scheme under which UMDNJ was a net beneficiary. The prosecution argued that the funding from the state legislature was the actual loss, and the court rejected that on grounds, as it analyzed the statute, and that ruling is not under appeal. So the only loss, if there is a loss at all in this case, is Bryant's salary. But the statute talks about real pecuniary loss suffered by the victim, and there was no real pecuniary loss. Both the government's theory and the evidence was that this was a benefit. What was the amount of restitution that was requested? It was an entire amount of salary. It was $113,000, something like that. And was that basically the salary? That was the entire salary. The second reason that we think the restitution order in this case is inappropriate, and at least warrants a remand, is that we urged at sentencing that the court consider how much of this was a quote-unquote low-show job. Not a no-show black-and-white theory, but a low-show job in which there was evidence that Senator Bryant showed up, did some work completely unrelated to his status as a legislator, and the court did not evaluate. If the court had said, I find X percent of his salary reflected legitimate non-bribery work and Y percent otherwise, we would be here on a different record with a different issue. Who had the burden on the set-off issue? We contend that the government had the burden, but even if we had the burden, there was ample evidence in the record. We're not looking for a new evidentiary hearing. We're saying that there was ample evidence in the record that showed specific things that Senator Bryant did. There was also a distinction between... How would you value that? I mean, how is the judge to value what those services were worth? The judge could value them by looking at percentage of time, by taking any other... Did you make any other suggestions? We asked the court to consider this issue, and the court, as a threshold matter, says, no, I'm ruling that the entire salary is the amount of the loss, and so we think that there has to be, at the very least, a remand for a consideration of this. Mr. Jacobs, thank you very much. Thank you, Your Honor. Mr. Gross? Good morning. Excuse me for a moment. Oh. It sounds like you have the same cold I have. I'm sorry? It sounds like you have the same cold I have. It was fine until yesterday afternoon about 1 o'clock. Good morning. Norman Gross on behalf of the United States. There's a lot to respond to here. Unless the court wants me to take a different sequence, I'll address the claims as they were presented by the defense. Sounds fine. Thank you. First, the 1346 instructions. And the basis of the attack, of course, is the Supreme Court's Skilling decision, which came down after the trial in this case. Now, what Skilling said, Skilling didn't really say anything about dementedness, dual intent, or any of those instructions. What Skilling said was that bribery and kickbacks were in the core of the honest services fraud that was established by the courts before McNally was decided. It didn't say that there was core bribery and kickbacks and bribery and kickbacks that were not part of the court. It said honest services fraud has a core of kickbacks and bribery. So the easiest way to resolve this case is to conclude, to read Skilling for what it held, which is the government can't proceed on a concealed conflict of interest theory under honest services fraud, but it can proceed under a bribery or kickbacks theory. At the motion to dismiss stage, Judge Wilson knocked out our concealed conflict of interest theory in this case. And she did not instruct on that theory. We did not argue that theory. What we argued was a quid pro quo bribery theory. Now, I'm not going to belabor the precise language of the instructions. I think that Your Honors have demonstrated that you're very familiar with those languages, but with respect to 1346, the judge did instruct that we have to prove a quid pro quo, an exchange, and an exchange for official actions. Now, the defense theory, as I understand it, is that if Bryant comes in to Gallagher and says, I'm the chairman of the Senate Budget Committee and I'm willing to perform official acts that will result in a whopping increase in your budget. If you give me a low show job of $35,000, by the way, you don't even need me to perform. I'm just asking for a job, even though the university's not advertising for a job. But let's not talk about what those official acts are now. Let's let those official acts arise on an as-needed basis, because, by the way, we're not really in the middle of the budget negotiations at this point. That's down the road. And there are other circumstances by which I might be able to shovel more money to SOM. There's the MAC accounts. There is, I could perhaps get involved in how the state's going to allocate funding for cancer research. But we won't talk about those now. We won't reach a specific agreement of this for that at this point. I'll just be on retainer. Well, it's not surprising that no court has ever said that that doesn't fall within the ambit of quid pro quo bribery. The law has to take into account common sense and practical realities. And this case demonstrated that, in practice, when people engage in this sort of quid pro quo bribery, this is precisely the way that you would expect it to go. Well, two arguments that are made. First, that it was a gratuity theory, and second, that it was a concealed conflict of interest theory. Your Honor, the instructions just didn't permit a conviction on either of those theories. In fact, the court expressly ruled out the possibility of a gratuity by saying that not every payment to a public official is a bribe, and payments that are made to build goodwill are not bribes. That's a classic gratuity. Nor did the court instruct that the jury could convict either of these defendants if the payments were simply given for or because of an official act. Ms. Madison talked about the Sundiamond case. I have a couple of responses to that. First, this court in Antico, which both Judge Sirica and Judge Ambro, said that Sundiamond was a case that construed a particular gratuity statute. That's Section 201C. And the language in that case is what drove Justice Scalia's opinion as to why you needed a specific act to link up with a payment. But here, the bribery statute that's incorporated into honest services fraud bribery requires a corrupt intent to influence. That's missing in the gratuity context. There's no requirement for an intent to influence. And so Sundiamond just doesn't advance the ball at all for the defendants. Could you touch on the due process arguments? Yes. At the time that we placed the legend on these grand jury subpoenas, there was at least one case from the Seventh Circuit, the Agostino case, that said that it was permissible for the government to request the grand jury witness not to talk about what happened in the grand jury. The reasons for that are obvious, that an investigation that is able to maintain the confidentiality of the information that's being collected in the grand jury is more likely to succeed because if information gets out to potential targets of the investigation, they may try to influence other people who they know are witnesses. There's another beneficial aspect of grand jury secrecy, and that is if people are speaking in the grand jury about possible targets and those people are never indicted, it would be detrimental to those people to have it disclosed that they were mentioned in the grand jury. So the government, you know, there was a lot of accusations hurled here about the government. But obviously it's one end of the sword. But the other edge is that it discourages a reasonable law-abiding person from speaking to the defense in order to allow the defense to prepare. And that clearly presents a problem. Now, the question here is, was there significant pressure? I mean, the judge said, look, you've got to send out the letter telling them that they are free to talk to the defense. But I take it this policy has ceased? We have addressed the issue of this policy, and it is now the policy of the U.S. Attorney's Office not to put these legends on grand jury subpoenas to avoid the kind of litigation. What about what is said to them in the grand jury room? Yes, yes. What? Yes, yes what? Yes. I'm sorry. The prosecutors are instructed not to request grand jury witnesses not to speak with the defense counsel. There has been no shred of prejudice. The notion that Mr. Jacobs is advancing, which is, you know, there can be no cure for this because we don't know what the witness would have said if they had spoken to defense counsel earlier, is really a structural error kind of argument, a kind of error that can never be cured. You know, those are the only errors in which this Court says that no remedial action, and the Supreme Court said no remedial action is sufficient. And what is a structural error? That is, you know, the absence of a neutral tribunal, the complete absence, deprivation of counsel without the defendant's consent. I think structural error has also been applied to the equal protection violations in the selection of the jurors. But that is not this case. Was there any suggestion to UMDNJ in connection with the deferred prosecution agreement that it should discourage its employees from collaborating with the defense or talking to the defense? Your Honor, if we take Mr. Poplar's affidavit in this case, it's true, and this is why Judge Wolfson appropriately denied an evidentiary hearing. What she said during the argument on this matter, and they were almost precisely three years ago today, Judge Wolfson said that I'm basically giving you your remedy now without you having to prove that there was actual interference. But this Court in Hines, a case that I cited in one of my, unfortunately, several 28J letters to the Court, said that if there's no material issue of fact that needs to be resolved at an evidentiary hearing, if everything that the defense has proffered is true and they still don't get relief. And Mr. Poplar did not proffer any evidence. He talked to a lot of people on the phone, including counsel for UMDNJ, counsel for Rutgers, who Judge Wolfson subsequently knocked out of the case, and so there was really no reason to talk to him. Counsel for UMDNJ at no point said, listen, the reason that I'm telling my employees not to speak to you is because I'm getting pressure from the government for the monitor. It may have been in the mind of UMDNJ counsel that it would be helpful to UMDNJ not to cooperate with Mr. Poplar, but that was their decision. Counsel for UMDNJ is not a government actor in this case, and their actions can't be attributed to us unless we direct them to do something. It's the same as in a Fourth Amendment case where a private party goes in and searches an area and then turns the information over to the police. There's no Fourth Amendment violation unless we directed the private individual to undertake that action. There were numerous questions by I think every member of the panel. Let's go back to the jury charge again on 1346, and then I guess you can get to 666, but I gather that the defense is saying that part of the requirement here is an intent to alter official action and that it wasn't charged and there was no evidence of that. Right. As we said in our brief, there was an instruction that in order to convict a quid pro quo bribery, there had to be an intent to influence. Now that language, that word influence, comes straight out of Section 201, the Federal Bribery Statute, and Skilling said that the Federal Bribery Statute in Section 201 and Section 666 form a basis for the bribery offenses that should be part of this national law of honest services fraud bribery. And so whether we charged intent to alter or intent to influence, there's no significant difference there. If the argument is that there was, and I heard Ms. Madison say today for the first time I believe, that we didn't have to prove that there was actual alteration of Mr. Bryant's conduct. In other words, we didn't have to prove that he did something that he otherwise wouldn't have done. I think I heard her concede that. If she's not conceding that, we've set forth in our brief, and I think Judge Ambrose touched upon that, if we don't have to prove that the bribe taker did anything at all, it's just simply illogical for us to have to prove that he took action that he wouldn't otherwise have taken. Now as for whether there was sufficient evidence that Senator Bryant was influenced by the $35,000 a year he was getting for this low show job, there was arguments throughout the defense brief on the sufficiency claim, and I know they're not, they haven't made that argument here, but Judge Sirica, you asked about it. The Biagi case, the Second Circuit's decision from 1999 that is cited and discussed in the briefs on the question of whether dual intent is permissible, had this to say. We have recognized, especially with respect to public officials, that evidence of the receipt of benefits followed by favorable treatment may suffice to establish circumstantially that the benefits were received for the purpose of being influenced in the future performance of official duties, thereby satisfying the quid pro quo element of bribery. Well, we had a lot more than that in this case, but we certainly had that. And I heard Ms. Mathison say again, recapitulating an argument that she made to the jury, that Senator Bryant simply bestowing millions of dollars on SOM after he went on the payroll because it was consistent with his legislative priorities. There was simply no testimony by anybody with personal knowledge about what Senator Bryant's personal legislative priorities were, and even if there was, the jury was not required to credit that on sufficiency review. So the instruction was accurate, and the evidence certainly was sufficient to show that the money was given by Dr. Gallagher to Senator Bryant to influence his official actions. I'd like to turn then to restitution. It looks like the $113,000 was in effect saying you need to disgorge the unjust enrichment that you got, and that's not usually what is a good way to have restitution. Your Honor, if that was the theory, then that would have been correct. I agree that restitution does not proceed under a disgorgement theory. But UMDNJ was the victim, and I think it's appropriate to sort of look at this case from the perspective of UMDNJ as an extortion, and Hobbs Act extortion can be proved by someone acting under color of official right. That's one of the three ways that you can show extortion, and that's really what happened in this case. Senator Bryant marched into President Cook's office and basically demanded a paid pensionable job while they were discussing pending legislation before the New Jersey Senate, part of which would have provided money for SOM to have an additional building in Camden. He shook President Cook down. He extorted this job out of him. This is a job that UMDNJ didn't need. It hadn't requested anybody to fill, and as a result, because the university was rightfully concerned about the power that Senator Bryant exercised over state funding. But what did UMDNJ lose that needed to be restored? They lost $113,000 plus in salary payments and bonus to Senator Bryant that they should not have paid. Senator Bryant was exercising his official power to steer money, either money that had already been allocated to UMDNJ to be allocated within the university. He carved out $2.3 million to go to SOM. And can I just say parenthetically, Ms. Mathieson's arguing the facts when she says that Senator Bryant didn't originate this. There was plenty of testimony from people involved in the legislative process that Senator Bryant was instrumental in that carve out. But Senator Bryant took official action, which substantially benefited SOM. And that's work that he should have done because he was being paid as a state senator to do it. He shouldn't have had to get a bribery payment in order to work on legislation that decided how this money was spent. If all Senator Bryant was doing was enforcing his legislative priorities, he's supposed to do that for whatever his Senate salary is, and not for the additional payments that UMDNJ had to make in order for Senator Bryant to take those legislative acts. There are recent cases from the courts of appeals. McNair is one that we cited. Crawley, I believe a Fifth Circuit case is another, that says in these contexts that when a public official violates his duty of honest services through bribery, that those bribe payments represent a loss to the public. Was there any funding for UMDNJ that was diminished as a result of the increased funding, for example, for the SOM centers? I'm sorry, was there? Was there any diminishing of funding for UMDNJ as a result of the increase in funding to SOM? If you look at the entirety of UMDNJ, which included SOM, I don't think the evidence showed that UMDNJ lost any state funding. What they lost, what they shouldn't have had to pay, was that corrupt salary. So, from your point of view, it is irrelevant that SOM may have benefited millions of dollars. If they had benefited zero dollars, it's not the same. SOM as an institution, Your Honor, was not the victim of this fraud. I'm sorry, UM, the medicals, the parent. UMDNJ. UMDNJ. I'm sorry, could you repeat the question? The fact that, well, they benefited as well. You're saying don't look to, if there was any benefit to the medical center, that's irrelevant. Whatever benefit they got was benefit that they should have received by Senator Bryant performing his official duties for his official salary, and not this quit that he extorted from the university for doing the work that he should have done. And even if they had not gotten any benefit at all, if he was unable to get them additional money, it shouldn't have made any difference. Oh, particularly, Your Honor, if he was taking $113,000 and conferred no benefit on them whatsoever, then restitution would have been appropriate. And I see my time is up. There was a second prong to the restitution argument, that is. Now, we'll give you time to answer whatever was raised. Thank you. The argument was that Senator Bryant and Dr. Gallagher were entitled to some sort of offset for the legitimate work, the supposed legitimate work that he did for SOM. And that would have required a finding by Judge Wilson that there actually was legitimate work. In the context at the sentencing hearing of the discussion about restitution, Judge Wilson said that Senator Bryant did virtually nothing in return for his substantial salary other than perform official acts. Now, if the defendants wanted an offset for encouraging commencement speakers or speaking one day a semester to classes for which there was some evidence, which Judge Wilson did not have to credit, then it was incumbent upon the defendants to at least give Judge Wilson some framework for what those services were worth. Dr. Gallagher was the dean of the School of Medicine and an administrator there, and he certainly could have presented evidence or at least some theory to say, Judge Wilson, you know, when we get a commencement speaker, we pay them X, or we don't pay them X, but we would pay them X. It has some monetary value, which other than just prestige or goodwill, some dollar amount that we can sell off against this $113,000, and they simply didn't do that. And the cases that we cited, and there's no contrary authority, is that the burden of proof for establishing the offset is on the defendants. Anything else you want to tell us? Just very briefly, I'm sorry I didn't mention it. On the 666 count, there is some division between the courts of appeals on whether a quid pro quo language, an exchange language, has to go in the instruction. So your position is they got something they weren't entitled to, perhaps? They did. Judge Wilson charged the language of this statute. What does 666 require? It requires a payment given to influence. And Ms. Mathison's argument is bribery is bribery is bribery, quoting from her reply brief. Well, there are different statutes that prescribe bribery, and they describe it with different statutory language. And 666 is a bribery statute, and it describes it as payment given with the intent to influence and payment accepted with the intent to be influenced. That's what was given in this case. And to charge the statutory language just can't be improper. It follows this court's model instructions on 666. But this court doesn't even have to decide whether or not those instructions were wrong. The jury made an express finding that there was a quid pro quo exchange with respect to counts one through six. And unless Your Honors accept Ms. Mathison's argument that those instructions were deficient for the reasons that she stated, I submit that you have to affirm the 666 count because it had to have been, any error would have had to have been harmless because the jury found that element based on proper instructions. Thank you very much. Thank you very much, Mr. Gross. Ms. Mathison. Very briefly, Your Honors, and just on the 1346 point, unless the court wishes to hear anything else. First, our reply brief at page two states as explicitly as it's possible to state, we do not contend that there must be an actual alteration in the official action because that would be equivalent to saying that the scheme must come to fruition, and that's not the way mail fraud works. What there must be is an intent to alter the official action, and that's what these instructions allotted. Now, it's true that Skilling did not have occasion to actually define bribery because it wasn't before the court, but it told us where to look, and that's the pre-McNally case law in section 201 and section 666. In the hypothetical that Mr. Gross just posed to the court about what he referred to, interestingly, as extorting a low show job, he said that it's still bribery without the this for that. This for that is the English translation of quid pro quo. This court has already held that bribery requires a quid pro quo, and Mr. Gross's argument illustrates that the proof in this case was not consistent with that. Justice Scalia and Son-Diamond told us that we needed to firmly delineate bribery from gratuity from legal payment because of the danger of ambiguity in section 201. This court basically followed what we said in Kemp, which was that bribery requires a specific intent to give or receive something of value in exchange for an official act. Yes, Your Honor, and we contend... It pretty much parrots the statute, doesn't it, or it comes close to it. Parrots which statute, Your Honor? Well, 1346, to influence an act. Well, 1346, Your Honor, is just the honest services fraud statute. It's close to 666 in the concept of intent to influence. Of course, there is the separate issue of whether the reward language in 666 encompasses gratuity, but that question is not before the court. The intent to influence formulation is exactly how this court has defined quid pro quo. The point on 666... I'm sorry. Was it 666 or 1346 where the quid pro quo instruction was given where the government is saying it wasn't even necessary? That's 666, Your Honor. The government is saying it's not necessary, but that's incorrect because the case law that says 666 does not require quid pro quo is case law that does so in recognition of the availability of a gratuity theory, which the government, including Mr. Gross, expressly disclaimed before the district court. So the only question here is how to define that influence prong, and this court has already stated that intent to influence or to be influenced is quid pro quo. What instruction would you have given on 666 to be absolutely everything you wanted? The instruction, Your Honor, should have been the intent to exchange a thing of value for an official action. If it were to be everything we wanted, Your Honor, it would include a specific official action, and it would perhaps define the intent to influence further as including the intent to alter or to cause an official action that would not otherwise have happened in accordance with the First Circuit's instruction that was given in Osceola. And if you were explaining this to a jury, how would you put this in about 25 words or less? Here's what you need to find in order to convict my client. The formulation that I often use with juries, Your Honor, is that this for that is different from this and that, and the exchange is a causal link, that the thing of value causes the official action and the official action elicits the thing of value. That sounds like the quid pro quo instruction that was given. It's not the quid pro quo instruction that was given in 666, Your Honor, and even the quid pro quo instruction that was given in 1346 was then undermined by the as-needed concept, which Mr. Gross continued to describe to this court in his argument, as echoing Your Honor's hypothetical about demanding a low-show job. He called it extortion, Your Honor, but that's not trading the specific official action. He told this court that it can be bribery absent the this for that. This for that is quid pro quo.